UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Metro Produce Distributors, Inc., a
Minnesota corporation,                                  Civil No. 05-2368 (PAM/JSM)

                        Plaintiff,

v.                                                      **MEMORANDUM AND ORDER**

City of Minneapolis, a Minnesota municipal
entity; Anne Stahn, in her individual and
official capacity as an employee of the
City of Minneapolis; Julie Casey, in her
individual and official capacity as an employee
of the City of Minneapolis; Gary Schiff, in his
individual and official capacity as an officer
of the City of Minneapolis; and Lori Olson,
in her individual and official capacity as an
employee of the City of Minneapolis;

                        Defendants.

_____

        This matter is before the Court on cross-Motions for Partial Summary Judgment and

Defendants' Motion to Amend the Answer.  For the reasons that follow, the Court grants in

part and denies in part Plaintiff's Motion and denies Defendants' Motions.

**BACKGROUND**

**A.      Plaintiff Metro Produce Distributors**

        Plaintiff Metro Produce Distributors receives truckloads of fresh produce from

interstate distributors and distributes the produce to grocery stores and restaurants in

Minnesota and western Wisconsin.  It also hauls produce to Illinois, Missouri, Iowa, and

North Dakota.  Many of its customers operate twenty-four hours a day and under an inventory system that demands timely deliveries and does not tolerate order shortages.

Metro Produce handles approximately 128 truckloads or 5.76 million pounds of fresh produce per week.  This equates to an average of eighteen truckloads or 810,000 pounds of produce per day.  The trucks that deliver produce to Metro Produce generally are either refrigerated or temperature-controlled to maintain the quality and safety of the produce.

Metro Produce distributes approximately fifty percent of the produce via morning deliveries, which leave the distribution center between 2:00 a.m. and 6:00 a.m. and return between 6:00 a.m. and 11:00 a.m.  Metro Produce delivers approximately fifteen percent of its goods via afternoon deliveries, which leave the distribution center between noon and 3:00 p.m. and return between 3:00 p.m. and 7:00 p.m.  Trucks leaving the distribution center between 5:00 p.m. and 8:00 p.m. and returning between 9:00 p.m. and 1:00 a.m. distribute the remaining thirty-five percent.

Since 2002, Metro Produce has been located at 2700 East 28th Street in Minneapolis, Minnesota.  The site is zoned I-2 Medium Industrial, which provides locations "for medium industrial uses and other specific uses which have the potential to produce greater amounts of noise, odor, vibration, glare or other objectionable influences . . . and which may have an adverse effect on surrounding properties."  Minneapolis, Minn., Code § 550.260 (2006).

**B.** **Defendants and City Ordinances**

Defendants are the City of Minneapolis and several municipal employees: Defendant Anne Stahn is an environmental inspector; Defendant Julie Casey is a licensing inspector; Defendant Gary Schiff is a city council member; and Defendant Lori Olson is a staff member of regulatory services.

The City has enacted a noise ordinance based on several findings, including that excessive noise is harmful to Minneapolis residents and interferes with the well-being, tranquility, and privacy of residences. See id. § 389.10. Three provisions of the noise ordinance are at issue in this case. Section 389.100(2) prohibits the "[l]oading, unloading, opening, closing or other handling of boxes, crates, bottles, containers . . . or similar objects outside of an insulated building in a residentially used area[1] between the hours of 10:00 p.m. and 6:00 a.m." Id. § 389.100(2). Section 389.100(7) prohibits the "[i]dling of buses, trucks, tractors, truck-tractor, trailers and semi-trailers . . . while stopped, standing, or parked in a

---

[1] The Code defines a "residentially used area" as:

> Any building or portion thereof designed or used exclusively for human habitation, including single-family, two-family, and multiple-family dwellings without regard to their size or location within the city plus any area within five hundred (500) feet of such building or portion thereof which is so used. Residentially used area shall include any mixed use building which contains a dwelling unit as defined in section 522.40 of this Code plus any area within five hundred (500) feet of such dwelling unit. Residentially used area shall not be established by the locations of buildings which are principally hotels, motels, or rooming houses.

Minneapolis, Minn., Code § 389.30 (2006).

3

residentially used area between the hours of 10:00 p.m. and 6:00 a.m." Id. § 389.100(7).[2]

Section 389.100(8) forbids the "[o]peration of a mobile refrigeration unit[3] while stopped, standing or parked outside of an insulated building in a residentially used area between the hours of 10:00 p.m. and 6:00 a.m." Id. § 389.100(8). The City added §§ 389.100(7)-(8) to the noise ordinance in 2005 after Schiff received several complaints by residents that Metro Produce operations were noisy throughout the night.

Since 2005, the City has cited Metro Produce several times for violating the noise ordinance. For example, Stahn cited Metro Produce on August 9, 2005, after observing two trucks at Metro Produce at 10:30 p.m. She reported that one truck idled for fifteen minutes, and the other truck idled for twenty-five minutes. Metro Produce was charged $200 for violating § 389.100(2) and $200 for violating § 389.100(7). On August 10, 2005, Stahn observed a truck pulling into Metro Produce at 5:30 a.m. She charged Metro Produce $400 for violating § 389.100(2). She also reported that four trucks idled for thirty minutes at 5:30 a.m., and she charged Metro Produce $400 for violating § 389.100(7).

---

[2] Several exceptions to the general prohibition exist. For example, idling is allowed if done so in compliance with traffic signals or signs, at the directions of a police officer, or while buses are in the act of loading or unloading passengers. See id. § 389.100(7). Also, emergency vehicles, ambulances, public works and public utility vehicles, and government vehicles are excluded from the provision. See id.

[3] The Code defines a "mobile refrigeration unit" as a "refrigeration chiller powered by an auxiliary engine or electric motor that is mounted on a truck body or a trailer container for the purpose of providing chilled air to the contents of the truck container or trailer." Id. § 389.30.

Thereafter, Metro Produce received a letter from the City stating that Metro Produce was delinquent on both of the August violations. Metro Produce contacted both Stahn and Casey regarding the notices. Metro Produce claims that these city employees threatened to charge Metro Produce $250 for each of the 100 complaints received about Metro Produce if it challenged the citations at an administrative hearing. Metro Produce also claims that the city employees threatened its officials with the prospect of jail.

The Fourth Amended Complaint attacks the ordinances on several grounds. Count One seeks a declaration that all three provisions at issue are unconstitutional. Count Two seeks a declaration that the Clean Air Act preempts §§ 389.100(2) and 389.100(7). Count Three claims that all three provisions are unconstitutionally vague. Count Four asserts that all three provisions violate the Commerce Clause. Count Five seeks relief under 42 U.S.C. § 1983 based on the allegedly arbitrary and capricious enforcement of the provisions. Count Six claims that all three provisions constitute a bill of attainder. Count Seven contends that Defendants conspired to obtain the unlawful revocation of Metro Produce's agricultural permit issued by the State of Minnesota. Count Eight asserts that Defendants violated the Sherman Act, 15 U.S.C. § 2, by attempting to revoke Metro Produce's state permit and by passing the ordinances.

In the cross-Motions, both parties seek summary judgment on the constitutionality of the provisions and on the § 1983 claim.[4] Defendants also move to amend their Answer to

---

[4] Neither party moves for summary judgment on Count Seven or Count Eight.

add the affirmative defenses of qualified immunity and failure to mitigate damages.

## DISCUSSION

### A.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Id.  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996).   However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Enter. Bank, 92 F.3d at 747.  A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

### B.    Section 389.100(2)

Section 389.100(2) prohibits the loading, unloading, opening, closing, or other handling of various containers outside of an insulated building in a residentially used area between 10:00 p.m. and 6:00 a.m.   Metro Produce claims that § 398.100(2) is unconstitutionally vague.

To survive a vagueness challenge, a law must satisfy two requirements. First, it "must provide fair warning by 'giving the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" Thorburn v. Austin, 231 F.3d 1114, 1120 (8th Cir. 2000) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). Second, it must provide "'explicit standards' for those who will apply the law in order to prevent arbitrary or discriminatory enforcement." Id.; see also Kolender v. Lawson, 461 U.S. 352, 357 (1983) (a regulation must define an offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.") (citations omitted).

Although the text of § 389.100(2) appears sufficiently clear to provide fair notice of what conduct is prohibited, the manner in which the City is applying the ordinance renders it unconstitutionally vague. The City is relying on the ordinance to punish conduct that is beyond the scope of the ordinance. For example, neither of the August 2005 citations record any type of handling of containers outside an insulated building. The August 9, 2005 citation is based on observations that a truck backed into the Metro Produce bay, and presumably loaded or unloaded containers inside the building. The August 10, 2005 citation is based solely on observations that a truck arrived at the Metro Produce parking lot at 5:30 a.m.

Moreover, deposition testimony indicates that city officials rely on § 389.100(2) to punish conduct not proscribed by the ordinance. The inspector who issued the citations testified that the ordinance prohibits activities such as entering the Metro Produce location, backing trucks into the Metro Produce facility, and opening the facility doors. (Petry Decl.

7

Ex. 6 (Stahn Dep.) at 47.)  Another city official testified that a violation occurs when a truck enters or leaves the Metro Produce facility between 10:00 p.m. and 6:00 a.m.  (Id. Ex. 2 (Casey Dep.) at 97-98.)  These actions do not involve the loading, unloading, opening, closing or other handling of containers.

The record shows that city officials have construed the ordinance to proscribe conduct that falls outside the scope of the ordinance.  This unpredictable construction and application of the ordinance deprives Metro Produce of its right to understand what conduct violates the law.  Thus, the arbitrary manner in which the City enforces § 389.100(2) renders it constitutionally infirm.  The Court therefore grants Metro Produce summary judgment on this point.[5]

**C.     Section 389.100(7)**

Section 389.100(7) prohibits the "idling" of various motor vehicles while stopped, standing, or parked in a residentially used area between 10:00 p.m. and 6:00 a.m.  Metro Produce claims that 389.100(7) is unconstitutionally vague.

Because the ordinary meaning of "idling" may be applied to interpret the ordinance, the lack of an express definition is not a constitutional flaw.  See St. Croix Waterway Ass'n v. Meyer, 178 F.3d 515, 520 (8th Cir. 1999) ("The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in

---

[5] Metro Produce also contends that § 389.100(2) is preempted by the Clean Water Act, and that the provision violates the Commerce Clause and constitutes a bill of attainder.  Because the Court finds § 389.100(2) unconstitutionally vague, it need not address these claims.

common usage and understanding.") (citing <u>Sproles v. Binford</u>, 286 U.S. 374, 393 (1932)).

Nonetheless, § 389.100(7) is unconstitutionally vague because the ordinance fails to provide

quantitative parameters that define the duration of prohibited idling or the amount of time

between when the vehicle stops and when idling becomes prohibited.   This vagueness

provides city officials unfettered discretion to apply the ordinance in an arbitrary manner.

For example, an official could cite one motor vehicle for remaining stationary one minute

and pass over another motor vehicle that remained stationary for thirty minutes.

On this point, <u>St. Croix Waterway Association</u>,[6] a case on which Defendants rely, is

distinguishable.  In that case, the challenged regulations prohibited motorboats from traveling

faster than the "slow-no wake" speed on certain areas of the St. Croix River.  The regulations

defined "slow-no wake" to mean "operation of a motorboat at the slowest possible speed

necessary to maintain steerage."   <u>Id.</u> at 517-18.   Because the prohibited conduct was

measured by the impact of the wake, boaters were given fair notice of the conduct proscribed.

Thus, the regulations provided minimal guidelines to determine whether a violation occurred.

<u>Id.</u> at 521.

---

[6] In <u>St. Croix Waterway Association</u>, the Eighth Circuit Court of Appeals ruled that the regulations were not unconstitutionally vague, even though they did not specify a numerical maximum speed and instead required operators to consider many variables in order to travel at a speed no faster than necessary to maintain steerage and create no wake.  <u>Id.</u> at 520.  In addition, it rejected the argument that the regulations were arbitrarily enforced, finding that the regulations "set forth a standard, albeit somewhat imprecise, which provides 'minimal guidelines to govern law enforcement.'"  <u>Id.</u> at 521 (quoting <u>Smith v. Goguen</u>, 415 U.S. 566, 574 (1974); <u>Kolendar</u>, 461 U.S. at 358).

In contrast, § 389.100(7) provides no reference to determine how long a motor vehicle may idle before violating the ordinance.  This vagueness provides law enforcement officials unfettered discretion in applying the law.  Thus, the vagueness that dooms this ordinance is not the product of uncertainty about the normal meaning of "idling," but rather about what idling is covered by the ordinance.  See City of Chicago v. Morales, 527 U.S. 41, 57 (1999) (ordinance unconstitutionally vague because it did not provide adequate notice of what type of loitering was proscribed).  The Court therefore grants Metro Produce summary judgment on this point.[7]

**D.     Section 389.100(8)**

Section 389.100(8) prohibits the operation of a mobile refrigeration unit while stopped, standing, or parked outside of an insulated building in a residentially used area between 10:00 p.m. and 6:00 a.m.  Metro Produce claims that the provision violates the Commerce Clause.

---

[7] Metro Produce also contends that § 389.100(7) is preempted by the Clean Water Act, and that the provision violates the Commerce Clause and constitutes a bill of attainder.  Because the Court finds § 389.100(7) unconstitutionally vague, it need not address these claims.

1.    <u>Standing</u>

As an initial matter, Defendants argue that Metro Produce lacks standing to assert a Commerce Clause claim. They submit that Metro Produce is a produce distributor—not an interstate trucking company.  Metro Produce responds that it has standing because § 389.100(8) inhibits its ability to conduct interstate operations.

To establish standing, a plaintiff must show an injury in fact, a causal connection between the injury and the conduct, and a likelihood of redressability.  <u>Jones v. Gale</u>, 470 F.3d 1261, 1265 (8th Cir. 2006) (citing <u>S.D. Farm Bureau, Inc. v. Hazeltine</u>, 340 F.3d 583, 591 (8th Cir. 2003) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555-560-61 (1992))). Injury in fact means that the injury is concrete and particularized, as well as actual or imminent.  <u>Id.</u>  In <u>Jones</u>, the Eighth Circuit found that a plaintiff has standing to bring a Commerce Clause claim if the plaintiff "does substantial business with out-of-state corporations and would suffer imminent business losses as a result of the challenged law." <u>Id.</u> at 1266.  It further held that a plaintiff need not show that it contracted with out-of-state corporations; rather, it need only show that the law burdens its ability to conduct interstate operations.  <u>Id.</u>

Metro Produce has suffered injury in fact because it has been unable to conduct its interstate operations.  That injury has been caused by the enactment and enforcement of § 389.100(8) and not by the independent action of a third party.  A decision favorable to Metro Produce (<u>i.e.</u>, finding § 389.100(8) unconstitutional) would remedy its injury.  Thus, Metro Produce has standing to bring the Commerce Clause claim.

2.    <u>Merits</u>

The Commerce Clause grants Congress the power "to regulate commerce . . . among the several states."  U.S. Const., art. I, § 8, cl. 3.  "Implicit within the Commerce Clause is a negative or dormant feature that prevents individual states from regulating interstate commerce."  <u>United Waste Sys. of Iowa, Inc. v. Wilson</u>, 189 F.3d 762, 765 (8th Cir. 1999).  The Dormant Commerce Clause keeps states from enacting "laws that discriminate against or unduly burden interstate commerce."  <u>S.D. Farm Bureau, Inc.</u>, 340 F.3d at 593 (citing <u>Quill Corp. v. N.D.</u>, 504 U.S. 298, 312 (1992)).

Dormant Commerce Clause analysis is two-tiered.  First, the Court must determine if the challenged action "overtly discriminates against interstate commerce."  <u>U & I Sanitation v. City of Columbus</u>, 205 F.3d 1063, 1067 (8th Cir. 2000).  Such discrimination may take one of three forms.  The action may be discriminatory on its face, may have a discriminatory purpose, or may have a discriminatory effect.  <u>Id.</u>  Discrimination in this context means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  <u>Id.</u>   If the ordinance overtly discriminates against interstate commerce, it will be invalidated unless the City shows, "under rigorous scrutiny, that it has no other means to advance a legitimate local interest." <u>See</u> <u>id.</u> (quoting <u>C & A Carbone, Inc. v. Clarkstown</u>, 511 U.S. 383, 392 (1994)). Second, a law that does not overtly discriminate against interstate commerce, but instead regulates even-handedly, will still be invalidated if "the burden it imposes upon interstate commerce is 'clearly excessive

in relation to the putative local benefits.'" Id. (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)).

Section 389.100(8) does not overtly discriminate against interstate commerce. Rather, it prohibits the night operations of both intrastate and out-of-state companies. Moreover, the record is devoid of evidence that the City intended to inhibit interstate commerce or discriminate against out-of-state companies. Rather, it shows that the City aimed to reduce noise in Minneapolis. Finally, the provision does not have a discriminatory effect on interstate commerce because it treats both in-state and out-of-state trucks the same way. No trucks—conducting either intrastate or interstate operations—are allowed to operate a refrigeration unit at night while parked outside an insulated building in a residential area.

Nonetheless, § 389.100(8) does not pass constitutional muster because the burdens imposed on interstate commerce greatly exceed the benefits to Minneapolis residents. The City passed the ordinance to control noise near the Metro Produce distribution facility. Indeed, residents near the facility have enjoyed less noise since the enactment of the ordinance. However, it is noteworthy that the facility is located in an I-2 Medium Industrial zone, which is reserved for areas that have the potential to produce greater amounts of noise that adversely affects surrounding properties. Thus, residents living near the Metro Produce facility were on notice that industrial operations occur in the area. Moreover, other area businesses use trucks, equipment, and trains that produce noise. Thus, § 389.100(8) does not prohibit most noise-producing activities; it merely forbids noise from refrigeration units.

Weighing against these benefits are considerable burdens on interstate commerce. Due to the fungibility of the product, § 389.100(8) requires fresh produce transporters to risk damaging their loads by turning off mobile refrigeration units.  Because the mobile refrigeration units must remain on, the ordinance also unduly controls the scheduling of interstate shipments to and from the distribution facility.  To comply with the ordinance, those involved in the produce supply chain must adjust their schedules to ensure that an enormous volume of produce is delivered in Minneapolis outside of peak hours for trucking and warehouse work.  Further, the ripple effect is tremendous as the produce distributors must also adjust schedules of other deliveries in other locations.  These significant burdens on interstate commerce exceed the local benefits conferred by § 389.100(8).  Accordingly, the Court finds that § 389.100(8) violates the Commerce Clause and grants Metro Produce summary judgment on this point.[8]

**E.     Section 1983**

Metro Produce asserts a § 1983 claim against the individually-named Defendants, claiming that they infringed on Metro Produce's constitutional right to access the courts.

---

[8]  Metro Produce also contends that § 389.100(8) constitutes a bill of attainder.  The Court need not address that claim because it finds the provision unconstitutional under the Commerce Clause.

1.    <u>Qualified Immunity</u>

Defendants rely on the doctrine of qualified immunity as a defense to the claim. However, Defendants failed to plead the affirmative defense in their Answer.  On December 21, 2006, two days before the hearing on the cross-Motions for Summary Judgment, Defendants filed a Motion for Leave to Amend Answer seeking to add the affirmative defenses of qualified immunity and failure to mitigate damages.  The pretrial scheduling order established a December 1, 2006 deadline for amending the pleadings.

Amending the answer after the deadline for the pretrial scheduling order has passed requires a showing of good cause by the moving party.  Fed. R. Civ. P. 16(b).  Good cause requires the party seeking the extension to show diligence in attempting to comply with the schedule.  <u>Id.</u> advisory committee's note (1983).  Moreover, "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief."  <u>Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.</u>, 187 F.R.D. 578, 582 (D. Minn. 1999) (Erickson, Mag. J.) (quoting <u>Johnson v. Mammoth Recreations, Inc.</u>, 975 F.2d 604, 609 (9th Cir. 1992)).

Rule 16(b) analysis does not focus on prejudice to the non-moving party, but rather on the showing of good cause and diligence of the moving party.  <u>Luigino's Inc. v. Pezrow Co., Inc.</u>, 178 F.R.D. 523, 525 (D. Minn. 1998) (Erickson, Mag. J.).  However, when examining the necessity for modification, the Court may consider prejudice to the non-moving party.  <u>Bradford v. DANA Corp.</u>, 249 F.3d 807, 809 (8th Cir. 2001).  The defense of qualified immunity is fact intensive and Plaintiff has not been given an opportunity to

conduct discovery on this issue because Defendants failed to plead this defense in a timely manner.  Dispositive motions are pending before the Court and discovery is complete; therefore, granting Defendants the ability to amend the Answer would necessitate reopening discovery.  At this point, reopening discovery would cause further delay and prejudice to Metro Produce.  See In re Milk Prods. Antitrust Litig., 195 F.3d 430, 438 (8th Cir. 1999).

Moreover, Defendants have failed to make a showing of good cause under Rule 16(b). Indeed, their Motion to Amend the Answer did not even address the issue of good cause. Defendants were aware of the availability of their proposed defenses well before the passing of the pretrial scheduling order deadline, but failed to move to amend the Answer by that deadline.  Because Defendants failed to show the issue of good cause under Rule 16(b), they may not add the defenses of failure to mitigate damages and qualified immunity.

The Court also rejects Defendants' argument that Plaintiff had notice of the qualified immunity defense by their use of the term "official immunity."  Qualified immunity is clearly distinct from official immunity, and thus, it is not reasonable to believe that asserting one gives notice of the other.  See Gordon ex. rel Gordon v. Frank, 454 F.3d 858, 862-866 (8th Cir. 2006) (describing the differences between qualified immunity and official immunity).[9] Because Defendants have failed to show that they were diligent in attempting to meet the pretrial scheduling order, the Court denies the Motion to Amend the Answer.

2.    Merits

---

[9] Had Defendants generally pled the defense of immunity, the Court may have found adequate notice.  However, Defendants specifically pled official immunity in the Answer.

Metro Produce claims that Stahn and Casey attempted to prevent Metro Produce from seeking access to the courts by threatening to assess Metro Produce approximately $25,000 if Metro Produce challenged the August 2005 citations.  In addition, Metro Produce claims that Stahn and Casey threatened Metro Produce officials with jail time if trucks returned or departed from the Metro Produce facility between 10:00 p.m. and 6:00 a.m.  Metro Produce argues that these actions violated its constitutional right of access to the courts in violation of the First Amendment.

Stahn and Casey do not deny making the statements but contend that the statements were neither threatening, harassing, nor retaliatory.  They submit that they merely informed Metro Produce of punishment available under the city noise ordinance.

> An individual's constitutional right of access to the courts "cannot be impaired, either directly . . . or indirectly, by threatening or harassing an individual in retaliation for filing lawsuits.  It is not necessary that the individual succumb entirely or even partially to the threat as long as the threat or retaliatory act was intended to limit the individual's right to access."

Harrison v. Springdale Water & Sewer Comm'n, 780 F.2d 1422, 1427-28 (8th Cir. 1986) (internal brackets and citation omitted).

However, the allegedly threatened punishment comports with the city noise ordinance. Under § 389.120, an individual who refuses to comply with the public nuisance provision of the noise ordinance,[10] or re-violates the provision within 180 days of receiving a cease order,

---

[10] The public nuisance noise provision prohibits "any person to make, continue, permit, or cause to be made or continued within the city, any loud, disturbing or excessive noise which would be likely to cause significant discomfort or annoyance to a reasonable person of

"shall be punished by a fine of not to exceed seven hundred dollars ($700.00) or by imprisonment for not to exceed ninety (90) days or both."  Minneapolis, Minn., Code § 1.30 (2006).  "Each day's continuation of a violation shall constitute a separate offense."  Id.

Based on the sparse record, the Court cannot determine as a matter of law whether the statements were threatening or merely informative.  Accordingly, an issue of material fact remains whether Stahn and Casey violated § 1983, and summary judgment on the claim is denied.

**CONCLUSION**

Both §§ 389.100(2) and 389.100(7) are unconstitutionally vague and therefore invalid.  Because the significant burdens on interstate commerce exceed the local benefits conferred by § 389.100(8), the provision violates the Commerce Clause.  The Court therefore grants Metro Produce summary judgment on those claims.  However, a question of fact remains on the § 1983 claim, rendering summary judgment inappropriate on that claim.

Accordingly, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motion for Partial Summary Judgment (Docket No. 73) is **DENIED**;

---

normal sensitivities present in the area."  Minneapolis, Minn., Code § 389.65 (2006).

2.      Plaintiff's Motion for Partial Summary Judgment (Docket No. 77) is

**GRANTED in part** and **DENIED in part**; and

3.      Defendants' Motion to Amend Answer (Docket No. 151) is **DENIED**.

Date:  January 24, 2007

s/ Paul A. Magnuson
Paul A. Magnuson
United States District Court Judge